## Advance Beneficial Order v. Penn. Safe Deposit and Trust Company and Josiah R. Adams.

*Corporation—Transfer of assets—Fraud.*

Where the owners of the entire stock of a trust company chartered with special privileges prior to the act of April 29, 1874, transferred all of the stock to other parties who changed the name of the company, and at the time of this transfer the entire assets of the company are assigned to a trustee who subsequently assigns them to a new trust company or-

ganized under the act of 1874 and its supplements, the holder of a certificate of deposit issued by the old company prior to the transfer of its stock and assets, cannot claim to share in the distribution of the property of the new company after insolvency, where it appears that the transfer of the assets of the old company had not been made for the purpose of defrauding creditors, and that the old company continued to exist, although under another name, and was financially responsible.

Argued March 21, 1900.   Appeal, No. 5, Jan. T., 1900, by Mary L. Schieffelin, Executrix of Edward Schieffelin, deceased, from order of C. P. No. 1, Phila. Co., June T., 1891, No. 873, dismissing exceptions to auditor's report, in case of Advance Beneficial Order v. Penn Safe Deposit & Trust Company and Josiah R. Adams.   Before GREEN, C. J., McCOLLUM, DEAN, FELL and MESTREZAT, JJ.   Affirmed.

Exceptions to auditor's report.

The auditor, Charles N. Mann, Esq., reported as follows:

There were two corporations, both known by the name of the Penn Safe Deposit and Trust Company, and both affiliated with the Spring Garden National Bank.   The first was incorporated under the name of the Penn Safe Deposit, Trust and Insurance Company by a special act of assembly, approved April 3, 1872, appendix to P. L. 1873, page 1067, and will hereafter be designated as the old trust company, to contradistinguish it from the trust company whose funds are before the court for distribution, and which will hereafter be designated as the new trust company.

Prior to May, 1889, the old trust company's name was changed to that of the Penn Safe Deposit and Trust Company.   Its capital was $100,000, and in May, 1889, all its stock was owned by the Spring Garden National Bank.   It had at one time owned part of the real estate upon which the bank building was erected and had constructed at a cost of less than $40,000 eight safe deposit vaults therein.   By virtue of sundry resolutions of the board of directors, the value of these vaults was increased to $100,000, and in May, 1889, were carried at that value on its books.   This trust company conveyed its real estate together with the vaults, to the National bank in fee, but entered into an agreement with the National bank providing for the use of the vaults by the trust company, except so much

thereof as the National bank should require for its own use, which was one of the eight vaults. With this state of facts in existence, Lewis E. Pfeiffer, on behalf of himself and his associates, entered into negotiations with the officials of the Spring Garden National bank to purchase the charter of this trust company, and offered $10,000 for it, which was accepted, whereupon the following agreement was executed:

"Memorandum of agreement made this 21st day of May, 1889, between Francis W. Kennedy of the first part, and Lewis E. Pfeiffer of the second part, witnesseth that the said party of the first part agrees to sell and deliver to the said party of the second part all of the capital stock of a corporation known as the Penn Safe Deposit and Trust Company, incorporated under the name of the Penn Safe Deposit, Trust and Insurance Company by act of assembly approved April 3, 1872; said stock to be sold and transferred without any dividends for the price or sum of $10,000; that with the transfer of said stock the original minute book and stock certificate book, and a sworn copy of the ledger account up to January 1, 1874, shall be delivered to the party of the second part, and all other books and papers of the said corporation shall be placed on special deposit with the Spring Garden National Bank, subject to inspection by the party of the second part, his heirs, executors, administrators or assigns whenever it may be necessary to protect him or them from any liability of the present corporation; and the said Francis Kennedy further agrees to save harmless the party of the second part, his heirs, executors, administrators or assigns from any liability of the present corporation. No assets of the corporation shall be transferred to the party of the second part, but only the full number of the shares of stock, so as to vest in the party of the second part all of the franchises of the said corporation. And in consideration of the said transfer the said party of the second part agrees to pay the party of the first part the sum of $10,000 on the 21st day of May, 1889."

In pursuance of this agreement, Mr. Pfeiffer paid to the Spring Garden National Bank the $10,000, and the National bank transferred to him and his associates all the stock of the trust company.

By decree of the court of common pleas, No. 3, for the county of Philadelphia, No. 763, of June term, 1889, made Septem-

ber 16, 1889, the name of the old trust company was changed to that of the "Philadelphia Finance Company."

It will be observed that the agreement between Mr. Kennedy and Mr. Pfeiffer of May 21, 1889, among other things, provided that "no assets of the corporation shall be transferred to the party of the second part, but only the full number of the shares of stock, so as to vest in the party of the second part all the franchises of the said corporation." Under this reservation the assets of the old trust company were conveyed to Robert C. Thomas in trust "for the same uses and purposes as the said assets were held and enjoyed by the said Penn Safe Deposit and Trust Company. And on the further trust to reconvey and assign all of said assets to a corporation to be created, of which corporation the corporators are to be Charles F. Heaton, Frank Brenton, Edgar A. Leslie, William M. Taylor and George W. Scouler, whether known by said name of Penn Safe Deposit and Trust Company or by whatever name they may adopt, to be held by this said new corporation precisely as said assets are now held by the present corporation known as the Penn Safe Deposit and Trust Company, of which H. G. Sickel is president." The above conveyance is dated May 21, 1889.

It was originally intended that the new corporation provided for under the foregoing trust should be capitalized at $100,000, and the stock subscribed for by the Spring Garden National Bank. Mr. Kennedy was advised, however, that to obtain the benefit of the provisions of the Act of May 9, 1889, P. L. 159, the capital of the new trust company would have to be not less than $125,000, as is required in that act.

To make up this capital the right to use the vaults was assumed to be worth $100,000, although the certificates filed in connection with the incorporation of the new trust company are silent on the subject. No one was willing to subscribe for the remaining $25,000 of capital stock, whereupon the following scheme was devised to raise the same. A promissory note for $25,000, to the order of the Spring Garden National Bank, payable on demand, was signed by the directors of the National bank as individuals, and then sitting in their capacity as directors, they ordered that the amount of the note should be passed to the credit of the new trust company on the books of the National bank. This was done, and thereupon the five cor-

porators named in the conveyance to Robert C. Thomas in trust as aforesaid, signed the certificate for the incorporation of the new trust company, and three of them acknowledged it and swore to the truth of the contents thereof.   Among other things, it sets forth that the capital was $125,000, divided into 1250 shares, of the par value of $100, and $12,500, being ten per centum of the capital stock, had been paid in cash to the treasurer; that each of the five corporators had subscribed for 250 shares, and they were chosen directors for the first year.   This certificate was dated September 27, 1889, and acknowledged and sworn to the same day.

The five corporators named in the certificate of incorporation were clerks in the bank, and were mere figureheads having no interest in the intended corporation, and in executing the certificate acted for the National bank.

The certificate was advertised and presented to the governor of the state, who, on November 8, 1889, issued letters patent thereon.   The new trust company was organized November 16, 1889, and certificates for the 1250 shares of stock issued, 1090 shares to the Spring Garden National Bank, and twenty shares each to the eight directors of the trust company.   The 160 shares issued to the directors were issued as stock to qualify them to act as such directors.   It did not belong to them, but was owned by the National bank, and, with the certificate for the ninety shares issued to the National bank, was transferred in blank.   The trust company then drew a check for $25,000 against the credit for that amount in the National bank, which arose from the promissory note aforesaid.   This note was then indorsed by the National bank " without recourse, " and with the 160 shares of directors' qualification stock and the ninety share certificate issued to the National bank, in all 250 shares, transferred in blank as aforesaid, deposited in the treasury of the new trust company, where it was found by the accountant.

The assets of the new trust company at the time of its organization, in November, 1889, nominally aggregated $142,767.84, of which $100,000 was the assumed value of the right to use the vaults, $25,000 was the directors' promissory note, and the balance made up of Sun Fire Insurance Company and sundry items carried as cash.   The liabilities, including capital of $125,000, necessarily equaled the assets, the balance being made up of a profit and loss account of $1,935.55.

On April 1, 1890, Robert C. Thomas, in execution of the trust provided for in the conveyance to him of May 21, 1889, exhibit B, as aforesaid, conveyed to the new trust company " all and singular the assets, all the safes, vaults, bonds, mortgages, and securities of every kind herein assigned to me to and for the only proper use and behoof of the said The Penn Safe Deposit and Trust Company so incorporated as aforesaid on November 8, 1889, its successors and assigns forever, to be held and enjoyed by the said company precisely as the assignor to me by the within paper held them."

The claim of the estate of Edward Schieffelin is based upon a certificate of deposit of the old trust company, of which the following is a copy :

" Penn Safe Deposit & Trust Company,

" 12th and Spring Garden Streets,

" No. 984.                    " Philadelphia, July 19, 1887.

" This is to certify, that Ed. Schieffelin of Alameda, California, has deposited with the Penn Safe Deposit & Trust Company for safekeeping, package        said to contain neither Certificates of Stock or Loans, registered or coupon bonds, or money, but only one hundred thousand dollars ($100,000), of United States four per cent coupon bonds valued at one hundred and twenty seven thousand dollars for which the sum of dollars has been paid to this company.

" In consideration whereof, the said deposit is to be safely kept by this company for the period of one year, and on the expiration thereof, or sooner, if demanded by the said depositor, it shall be returned to him in good order upon the surrender of this certificate, and the identification of depositor, if required.   In case of loss of deposit, the liability of the company to be limited to the above valuation.   This certificate is not transferable except by assignment endorsed hereon, and approved by the company.   If the whole or any of this deposit, shall be withdrawn before the expiration of said period, no portion of the charge shall be returned ; and if continued longer, it shall be deemed a renewal of the deposit on same terms, for which a like rate shall be chargeable.

" Registered July 19, 1887.

" W. M. T.                    Francis W. Kennedy, Pt."

In the margin:

" This certificate must be surrendered on the withdrawal of the deposit."

In 1881 or 1882, Mr. Schieffelin deposited the $100,000 United States coupon bonds with Francis W. Kennedy for safekeeping. Some time prior to July, 1887, Mr. Kennedy used these bonds as collateral security for loans. A day or two prior to July 19, 1887, Mr. Schieffelin, who was a resident of California, called upon Mr. Kennedy and asked that his bonds be put in the Safe Deposit Company and a certificate issued to him therefor. Mr. Kennedy asked him to call again which he did. In the mean time, Mr. Kennedy, using the facilities of the National bank, paid off the loans for which the bonds were held as collateral, and put them in a safe deposit box in the vaults of the trust company. Upon Mr. Schieffelin's calling, he was taken in and shown the safe deposit box with his bonds in it, and with the aid of a clerk in the bank he checked them off in accordance with a list he had, and found them all on hand. Thereupon the certificate of July 19, 1887, was issued to Mr. Schieffelin and he left within a day or two afterwards. In a few days afterwards, Mr. Kennedy again borrowed money on these coupon bonds as collateral security, and they never came back again into the custody of either the old or the new trust company. The use of these bonds was made without the knowledge of any of the officials of either the old or the new trust company, except Mr. Kennedy. After the failure of the new trust company in May, 1891, these bonds were sold, and the loan for which they were collateral security paid. The sale realized a surplus of about $7,300; Mr. Kennedy added enough to make it up to $7,500 and through his attorney, this sum was paid over on or about July 1, 1891, to the attorney of Mr. Schieffelin.

In February, 1892, Mr. Schieffelin brought suit in the United States circuit court to No. 269, October sessions, 1891, against the old trust company by its new name of " The Philadelphia Finance Company," and declared on the certificate of deposit of July 19, 1887, as aforesaid.

On March 15, 1892, plaintiff recovered judgment on this action against the defendant for want of an appearance. On March 29, 1892, this judgment was by agreement stricken off

and an affidavit of defense filed. The case was then pleaded to issue. On March 1, 1895, an order was filed to mark the case discontinued, ended and settled, and the clerk's costs paid.

On or about January 31, 1894, the old trust company paid Mr. Schieffelin $14,500 in compromise settlement of its liability under the certificate of deposit of July 19, 1887, as aforesaid, whereupon Mr. Schieffelin executed a release of which the following is a copy:

"Know all men by these presents that I, Edward Schieffelin of California, in consideration of the payment of the sum of fourteen thousand five hundred dollars, do hereby remise, release and forever discharge, the Philadelphia Finance Company its successors and assigns, heirs, executors and administrators of and from all, and all manner of actions and causes of action, suits, debts, dues, accounts, bonds, covenants, agreements, judgments, claims and demands whatsoever in law or equity, which against the said Philadelphia Finance Company I ever had, now have or which my heirs, executors, administrators or assigns or any of them hereafter can, shall or may have or by reason of any cause, matter or thing whatsoever, from the beginning of the world to the date of these presents, against Francis W Kennedy or any other party other than the Philadelphia Finance Company.

"In witness whereof I have hereunto set my hand and seal the thirty-first day of January, in the year of our Lord one thousand eight hundred and ninety-four.

"E. SCHIEFFELIN, [L. S.]

"Signed, sealed and delivered
    in the presence of
        "JOHN SPARHAWK, JR."

By the agreement of May 21, 1889, as aforesaid, Mr. Kennedy individually agreed to save harmless Mr. Pfeiffer and his assigns from any liability of the old trust company. The new trust company never in any way confirmed or ratified the action of Mr. Kennedy in making this indemnification agreement.

### CONCLUSIONS.

In deciding upon the merits of this claim, it must be determined:

1. Whether there was any written agreement on the part of the Penn Trust Company to pay the claim.

2. If there was no written agreement, whether there was any implied obligation or contract which warrants the claim being paid out of the present fund.

The first written agreement in the matter is the contract which Kennedy made with Pfeiffer and his associates when he sold them the old charter, and agreed that he would be responsible for the debts of the old Penn Trust Company.

Your auditor is of opinion that no right to a dividend from the present fund can arise by reason of this contract; it was a personal undertaking of Kennedy with Pfeiffer to be responsible for any outstanding liabilities of the old company.  When the new company was formed it never in any way ratified or confirmed this action on the part of Kennedy and never became liable for its fulfillment.  Nothing was done to change the contract from what it purports to be upon its face, a personal undertaking on the part of Kennedy.  The claimant cannot therefore maintain his claim that this contract was an obligation of the new company and inured to his benefit.

Kennedy might be considered a promoter of the new corporation, and as such his actions were not binding upon the proposed corporation, unless something was done by the corporation after it had been formed, to indicate an acceptance of them. In the words of Pepper & Lewis in their Digest of Decisions of Pennsylvania, volume 3, page 4825, "where a proposition is made to the promoters of a corporation, who, with other individual members, accept the offer, prior to incorporation, it is not a sufficient acceptance to bind the corporation."

If this contract is not binding, it remains to inquire whether there was anything in the written assignment of the assets to the new company which created an obligation to pay all the debts and obligations of the old company.

The contract of assignment expressly states that the assets should be held in precisely the same way in which they were held by the old trust company; this cannot be construed to mean that the new company pledged itself to pay all debts due by the old company that might be outstanding whether they knew of them or not, and no matter what their amounts.  This assignment can mean nothing more than that the new com-

pany took the assets subject to any liens that then existed against them in the hands of the old company. Whether this contract was valid, as the assets were being paid to the new company as a subscription to its stock, it is immaterial to decide, as this claim was not a lien, and this is not an attempt to follow the assets and to recover them or their value back again.

There was not, therefore, in the opinion of your auditor, any written agreement on the part of the new company to pay the debts of the old company.

The second question must therefore be considered. Was there any implied promise on the part of the new company, when they took the assets of the old company that they would assume all debts?

If the argument of counsel for the claimant is correct, it is immaterial that these assets were of small value, though appraised, for the purpose of forming the capital of the company, at a very high figure. If their argument is sound, the new company became liable for every debt, no matter how large, by the fact that they took these assets, and it is of no moment whether the assets were large or small. This position your auditor does not think sound; if a properly authorized person attempted to recover back the assets for the benefit of all the creditors of the old company it would then be a question as to whom these assets or their value belonged, but no such claim is presented here; the claimant does not contend that he is entitled to the value of the assets transferred; he relies entirely upon the implied promise or trust that is to be created for his benefit by the receipt of the assets. Your auditor therefore considers this question only.

It must first be noticed that the claimant was not injured by the assignment of these assets to the new company. He retained his claim upon his certificate against the company which issued it, and he pursued that corporation after it was purchased by Pfeiffer and his associates, and his claim was recognized and settled.

The claimant has not established that he had a lien upon the assets transferred, nor that any equities existed which in any way created an implied trust for his benefit. That this is true is shown by an examination of the facts of this case. Wit-

nesses speak of Pfeiffer and his associates having purchased the old charter, but this phraseology does not ·represent what was really done.   Pfeiffer and his associates continued the old corporation; they purchased all the stock and continued in business, merely changing the name of the corporation and its management.    There was, therefore, nothing in this sale which in any way affected the rights of Schieffelin or his claim against the company.   The corporation had a perfect right to dispose of any or all of its assets which were held at that time, provided .they did not defraud their creditors by so doing, and if Pfeiffer and his associates, after they undertook the management of this corporation, substituted assets far more valuable than those which had been passed over to Kennedy, the claimant would have no right to complain, nor could he say that he had any right or claim in the old assets that were transferred. Until the claimant has shown that he was defrauded by reason of the transfer of the assets to the new company, he has no right to follow those assets, nor to ask that the corporation who received them be held liable to him in any way.   So far as the evidence discloses, the change of management of the corporation that had issued the certificate of deposit may have been of the greatest benefit to the claimant, and if those new managers substituted cash for the questionable assets that were transferred, the advantage to him was unquestionable.   The evidence leaves us in ignorance as to these facts.   The claimant cannot, therefore, be said to have established his case.

It must also be noticed that when an implied contract is asked to be enforced in equity it is only in accord with equitable principles that an examination should be made of the circumstances under which it is claimed that the contract was made.   If this is done in this case, it is very clear that the present claimant is striving to take advantage of a fraud, for if the new company impliedly promised to pay all the old debts, they could only have done so because Kennedy fraudulently concealed this Schieffielin liability, and thus tricked them into assuming its burden.   The real value of the assets transferred was an inadequate consideration for such a contract, and it is not contended by the claimant that the new trust company would have agreed for a moment to pay this claim had they known of its existence.   A contract formed in such a way

could not be enforced against the present innocent creditors, even if the evidence warranted a finding that such a contract had an existence.

Your auditor is therefore of opinion, after carefully considering the facts of this case, that no contract, either express or implied, exists for the benefit of this claimant, and no equities are shown in his favor that warrant an award from the present funds.

The court without filing an opinion dismissed exceptions to the auditor's report.

*Error assigned* was in dismissing exceptions to auditor's report.

*John G. Johnson*, with him *John Sparhawk, Jr.*, and *William H. Snyder*, for appellant.—The new company took the assets charged with the duty of paying thereout the debts of the old company.

The new company was, in effect, the old company reorganized and, under all the circumstances, was liable personally to pay the debts of the latter: Miss. & Missouri R. R. Co. v. Howard, 7 Wallace, 392; Kittel v. Augusta, etc., R. R. Co., 65 Fed. Repr. 859; Hibernia Ins. Co. v. St. Louis & New Orleans Transportation Co., 13 Fed. Repr. 516; Rutten v. Union Pac. Ry. Co., 17 Fed. Repr. 480; Blair v. St. Louis, etc., R. R. Co., 22 Fed. Repr. 36; Montgomery Web Co. v. Dienelt, 133 Pa. 585; 2 Cook on Corporations, sec. 673; Vilas v. Page, 106 N. Y. 439; 2 Morawetz on Corporations, sec. 812; Broughton v. Pensacola, 93 U. S. 266.

*M. Hampton Todd*, for appellee.

OPINION BY MR. JUSTICE FELL, May 7, 1900:

The claim of the appellant to share in the distribution of the fund in the hands of the receiver is based upon a certificate of deposit of United States bonds issued by another trust company which is still in business and financially able to respond to any demand made upon it. Before the auditor her contention was that the new company was liable for the payment of the debts of the old by virtue of an agreement express or implied. This contention is conclusively answered by the re-

port of the auditor.  A new ground of liability is now presented,—that the new company took the assets charged with the duty of paying the debts of the old company irrespective of any contractual relation between them, express or implied. This can be only by reason of a fraud.  The old company could not divest itself of its assets in fraud of its creditors, and any one taking the assets in aid of a purpose to defraud, would be liable to the extent of the value of the assets received. But here there was no intent to defraud creditors, and no creditor was in fact defrauded.  The old company now known as the Philadelphia Finance Company has continued in business, and it is nowhere suggested that it is not fully able to meet all claims upon it.  While the appellant has a responsible party primarily liable, it cannot be said that she was injured by the transfer of the assets, and unless injured she has no standing to contest the transfer.

The decree is affirmed at the cost of the appellant.